Good morning, Your Honors. May it please the Court, my name is Marsha Morrissey and Lynn Coffin and I represent Petitioner George Wharton. If I may, I'd like to reserve five minutes for rebuttal. Your Honors, the jury in this case did not hear compelling evidence about George Wharton's genetically based and serious mental disorders, the toxic combination of a few weeks before Linda Smith's death. They didn't hear the relationship between his mental disorders and the charged crime and his prior conviction. And they did not. They had just a tip of the iceberg of what was George Wharton's hellish childhood. I'm going to, Your Honors, focus my remarks today on trial counsel's deficient representation in failing to present evidence of Mr. Wharton's mental state at the guilt and the penalty phases and hope to have some time to address the shackling. At the guilt phase, Your Honors, trial counsel made three errors that deprived Petitioner of a defense to the prior murder special circumstance, hence the death penalty. He made an error of law regarding heat of passion, which would have reduced first degree murder to second degree murder or even voluntary manslaughter because he mistakenly believed that a killing in a rage or an explosive killing could not negate premeditation and deliberation. Secondly, trial counsel knew that there was authority for an in limine motion to exclude evidence of the prior second degree murder conviction at guilt phase so that he could present a mental state defense. But he didn't say he was guilty. But isn't California law to the contrary, though, on that particular point? That is, if the mental health experts had testified, wouldn't the prior crimes come in as part of the cross-examination of did you know this about him and were you aware of that? No, Your Honor, not necessarily. There was authority in California to limit at the guilt phase. What's your best case for that? The best case for that is, I believe, People v. Rodriguez. I can provide the site. I don't have it right now. But it certainly, you can restrict evidence at the guilt phase. It happened here. In this case, they called Patterson, they called people who knew about the priors, and they, as they assiduously, the trial judge and the prosecutor, instructed those witnesses, do not talk about the prior, do not talk about the prior. And they all followed those instructions and things went swimmingly. But they said do not talk about the priors without his mental state having been put directly at issue. I've read the California cases, and the California cases almost all come up in the context of the priors having come in because the trial judge let them in, and the question was whether or not that was an abuse of discretion by the trial judge to do it. Yes. But it seems to me pretty clear that all of those cases show that the trial judge could have kept them out if he had wanted to do or she had wanted to do so. Yes, Your Honor. My problem is figuring out the likelihood of the success of the in limine motion and the way the appeals are going to show up. They're almost always going to show up when the evidence came in rather than when the evidence was kept out. That's correct, Your Honor, because there's not. What way do we have of assessing the probability of success of the in limine motion because the record of cases we have is, by the nature of the litigation and the nature of the appeals, necessarily skewed by the fact that we're going to be seeing the cases in which it was allowed, in which the priors were allowed in? I think the best example is what happened in this case. And there was no in limine motion that apparently was filed. The parties just agreed among themselves that this was going to happen. And it happened, and it went very smoothly. Now, unfortunately, trial counsel did present, put his client's mental state at issue at the guilt phase. There was an in-camera hearing, and at the conclusion of it, the court came out and said, I am confident that, you know, Petitioner's claim about the prior was instructed not to mention it, and no one did. Second thing that the third thing, rather, that trial counsel failed to do is he did not present a defense of involuntary or voluntary intoxication. Your Honor, the district court accepted as a valid trial strategy the decision not to present a mental state defense at guilt phase when, in fact, it was based on an inexcusable stakeholder mistake of law, because heat of passion, it can be fear, it can be revenge, it can be any highly wrought emotional state that causes judgment to give way to impulse or rashness. And that is the evidence that trial counsel had. Dr. Welts, he was the prosecution psychiatrist who evaluated Petitioner the day of his arrest. He was suffering from auditory hallucinations. His thought content was disorganized and derived from internal psychotic processes. And he told trial counsel that Linda Smith was killed during an angry outburst, followed by remorse and denial, as demonstrated by Petitioner behaving as if she was not dead for a period of several days. Trial counsel testified he thought the killing in an angry outburst was not helpful. Justice trial counsel did not think Dr. Steinberg's diagnosis of intermittent explosive disorder would have been very helpful. And so the jury did not hear Dr. Steinberg's opinions that there was a strong likelihood Petitioner was psychotic, with significant distortions of perception and loss of contact with reality at the time of the crime, and that his memory, his lack of memory, was reflective of him being in a psychotic state, and that it was unlikely the crime was premeditated. Now, the evidence of involuntary or voluntary intoxication came from two sources that were known to trial counsel. Dr. Stolberg, the psychiatrist, he told trial counsel it was possible that Petitioner killed Smith during an alcohol or drug blackout, which is why he couldn't remember the offense. Trial counsel described Petitioner's lack of memory as a continuing problem, tried to solve it with a sodium amytol interview. It wasn't a problem. It was a symptom that went totally unnoticed by trial counsel. Dr. Patterson, who testified, recommended an intoxication defense, but told trial counsel, we need more information. And he asked trial counsel to provide him with forensic records. He asked for an account of the prescription drugs that were found in the house. He recommended a consultation with Dr. Siegel, somebody that trial counsel had spoken to seven days before. Because of trial counsel's tardy consultation with Dr. Patterson, he received this information two weeks before the trial, and he didn't have time to present or develop an intoxication defense, and he didn't have time to present or develop an intoxication defense. Kennedy, you know, I know this is not necessarily the direct evidence of one thing or another, but do you know what experience Mr. Duvall had had in litigating criminal and capital cases at the time of this trial? Yes. He had litigated murder cases in juvenile court. He had one death penalty case prior to this. His client committed suicide the morning of closing arguments. It was a case in which he had made a tactical decision to tell the jury about a prior murder conviction at the guilt phase. And I think his experience in that case is what drove him to the position in this case, which is, I can't let the jury know about the prior conviction at guilt phase, which, of course, is problematic, because it doesn't make sense. Well, it's problematic, but it's also a reasonable strategy decision. If you take as correct, which I know you don't, that it was likely that a cross-examination of mental health experts would have revealed a prior murder and a prior rape, that kind of evidence is very likely to make a jury say, well, you know, he killed and raped his wife, and why isn't it rational and reasonable to select a different strategy that doesn't bring that information to the jury at the guilt phase? Judge Graber, it is rational and reasonable to make that decision if you have a chance of a defense at the guilt phase. Trial counsel had no chance of defending this case at the guilt phase, because he started off with a mistake of law. So that all the things, all the horrible things that he imagined, well, they'll think the defense lawyer is honest, and they'll hate the defendant. All of that, which can happen when you hear of prior crimes for the first time at a penalty phase, all that happened, and he had nothing in that penalty basket at that time. No, I'm asking you about the guilt phase. You were still talking, I thought, about the guilt phase. And if a lawyer is faced with a client who has very bad priors, as this individual does, and you have a way of keeping that information out at the guilt phase, why isn't that a reasonable strategy under Strickland? It is not entirely reasonable in capital cases, which must be viewed not in two discrete sections, but you have to one case one the guilt phase has an effect on the penalty  phase. You can't try each phase in isolation without any thought to what might happen. When you get to a penalty phase, you have to have an integrated defense. So that it was the idea of keeping these priors out at the guilt phase was good, but if you're going to be in a position where you're going to drop that bombshell on the jury at the guilt phase, which is at the penalty phase, which is what happened here, you better have some strategy of dealing with it. And, of course, trial counsel had no strategy, and his mistake essentially doomed Petitioner from the beginning, because what his failure to recognize the voluntary intoxication defense, what Mr. McMahon, the original lawyer, did early on, is that he could have presented a very effective defense, because the jurors may not like voluntary intoxication, but in this case, because of the prescriptions that were given to him by the Franklin Clinic, he had they were toxic. I mean, he trial counsel knew from Dr. Stolberg and from Dr. Steinberg that Petitioner said he took a dose of his three prescription meds, he went out, went to social services, he was trying to get Social Security so he could leave Lynda, and then he came back, and there was some angry words between them, he took a second dose of his prescription meds, and he left before he felt altered. We know he came back after that, and that's when Lynda Smith was killed. Now, trial counsel did not know about Dr. Babus, who was at the Santa Barbara County Jail, diagnosed Petitioner as a chronic paranoid schizophrenic, and learned from Petitioner that he overdosed on prescription medication before Lynda Smith went away, and those were Petitioner's words, and he overdosed because of the person who was told to do so by the person who lives inside him. Trial counsel didn't recognize that defense, and as a consequence, the jury did not hear that when Mr. Wharton was booked into Santa Barbara Jail, Dr. Babus changed his medication immediately to Trilofan, and his psychotic symptoms improved. They didn't hear from Dr. Agin, an emergency room psychiatrist who treated him for an overdose, who said the Triopil is a dangerous drug with lots of side effects, bad reactions, including agitation. Dr. Siegel said the Triopil is a stimulant, and people who use it can look like out-of-control cocaine users. And Dr. Patterson, trial counsel's own expert, did not testify that Triopil has an adverse effect in some, it often aggravates and worsening symptoms, and that in psychotic patients with schizophrenia, such as Petitioner, it was very causative of increased anger and agitation. Let me understand where this argument might be going. I understand the structure of the argument when you say he should have made an in limine motion to make sure that the priors won't come in, or at least to know whether or not they will come in, so that it's an informed decision then whether to put on the mental state. Are you now arguing that even if the priors were going to come in, it was a bad strategic choice not to present the mental evidence? Are you going that far with this argument? Yes. Even if the priors were not going to come in. Even if the priors were going to come in. Were going to. Well. I mean, that's what I'm asking. That's a more difficult question, Your Honor. I mean, we don't. Even with respect to an intoxication defense? In intoxication, I don't see how the priors should come in. I see. It was just like he's been intoxicated or altered by the prescription drugs. Got it. Yes. Exactly. So I don't need that. The priors aren't going to come in on that. Right. They're not relevant on that particular issue. Yeah. So Ergomar, another drug that Petitioner was taking, can cause mental confusion. And according to counsel's own witness, Petitioner was misprescribed Triavil and had an adverse reaction. So although Petitioner sought help, he was prescribed this drug. And it was Dr. Hamilton's testimony that at the Franklin Clinic, Petitioner received the best treatment that they could give. I'm going to move on to penalty, Your Honor, because even if trial counsel's mistake of law didn't invalidate his decision to forego mental state defense, a penalty at guilt phase, excuse me, all of this evidence that I've been talking about should have but was not introduced at the penalty phase. Now, this Court in its decisions in Wallace v. Stewart and Carroll v. Woodford has made clear that as to penalty phase, the burden is on trial counsel to provide all relevant information to experts. None of the five experts that were retained by trial counsel had all the information they needed to diagnose Petitioner. At the evidentiary hearing, Dr. Patterson testified that he didn't have sufficient background information to make an accurate diagnosis. He said that the observations of Dr. Wells and Dr. Babas, who saw Petitioner right after he was arrested, were critically important because they reported hallucinations. Dr. Patterson said his 1987 evaluation of Petitioner was deficient. It was a wholly inadequate explanation of Petitioner's behavior and inaccurately described what was wrong with him as more of a function of the killing than a cause of the killing. He diagnosed him as a brief psychotic reaction as a result of Linda Smith's death when he said that's – it was the cause. And he would have disavowed his 1987 – 1975 diagnosis of Petitioner as having antisocial personality disorder as totally inaccurate. Finally, Dr. Patterson should not have even been involved in this case because of his prior involvement with Petitioner. You know, that what happened in 1975 led to the following testimony at penalty phase from defense counsel's own expert. Petitioner was – had an inappropriate attitude towards the seriousness of the crime. He poorly cooperated with Pat Patterson. He was very defensive and guarded with Patterson. He was quick to take offense when Patterson spoke. And he talked to trial counsel about it, but the attitude never changed. Now, that was because Petitioner remembered Dr. Patterson. He remembered him in 1986 when his Franklin Clinic doctors wouldn't come to the police station after he had been arrested when he asked for them. And the police offered Dr. Patterson twice as an alternative. And Patterson, he – Petitioner said, I don't want to see that bum. Sotomayor, your time is winding down, and you have not yet discussed the one certified issue. Yes. I will, Your Honor. Thank you. Thank you, Mr. Shackling. District Court found that some of the trial jurors saw Petitioner being transported through the courthouse's public areas in visible restraints. And that finding is consistent with the testimony of the three jurors, Judge Dodds, the trial judge, the bailiff, Mark Liddy, the prosecutor in the case, Patrick McKinley, Deputy Public Defender McMahon, and the Santa Barbara Sheriff's Department transportation documents requiring that Petitioner be transported in leg irons and waist chains. Well, it appears to me, at least, that the district court's factual findings in this regard are perfectly well supported by the evidence. But my issue is prejudice. Where was the prejudice? There are numerous cases that distinguish between Shackling in court and Shackling outside of court. And when it's sort of a routine transport sort of sighting, there is very seldom prejudice found. So what is your response to that? My response, Your Honor, is that in this case, because of the unique circumstances of this case, it cannot be said that there was no prejudice. In the Central District of California ---- Isn't it your client's burden for out-of-court Shackling to demonstrate prejudice? So to say you can't prove that there wasn't isn't really good enough. And that's what I will do. This is a chain gang of inmates. They were shackled individually and then shackled together. And they were moved from buses at the street level and walked up these very long beautiful lawn of the Santa Barbara County Courthouse to the court building. Then once they were inside the building, they were moved through the public areas. And the bailiffs would literally have to move the public away. Right. No, it's all of which says they were seen, which my question already acknowledges that they were seen. But when it's sort of a routine, all defendants, it doesn't make him seem any more dangerous or guilty than all the other people who are moving hither and yon. And people are very used to security issues now. So what in this particular record demonstrates that the jurors were influenced in any way by these occasional sightings? I think the record shows the testimony of both Drew Burditt and Shelley Tasker shows that they failed to distinguish what they saw in the hallways from what they saw in the courthouse. Shelley Tasker, in particular, describes an incident that happened. Petitioner was in, she said Petitioner was in handcuffs at a point in a trial where he became upset during the playing of an audio tape and he was escorted. Except that the district court did not find any shackling occurred in the courtroom. That's true. And so that, so taking the facts as the district court found them, what is the prejudice? I'm taking the facts as the district court found them. I'm taking Shelley Tasker's testimony that she saw Petitioner escorted out in handcuffs wearing an orange jumpsuit. Now, that didn't happen. But we know that the incident happened. We know that there was an incident where Petitioner got upset and proceedings were stopped and he was taken out of the courtroom. That's at 7RT 1141-42. And we know that when Petitioner was transported, he was in a red or an orange jumpsuit. So that we know that, at least for Shelley Tasker, she couldn't distinguish seeing Petitioner out in the hallways from seeing Petitioner, you know, in the courtroom. And so she conflated the two. And what's more important, Your Honors, is that she remembered this 20 years later. Twenty years later. This was not a brief, inadvertent shackling. This was intentional. Everybody knew it happened. And nobody apparently did anything about it. Now, the issue is, did it have a substantial and injurious effect or influence on the jury's verdict? And we know from the Supreme Court's decision in O'Neill v. McAnitch, if the evidence of harm is an equipoise, Petitioner must win. If there is a grave doubt, Petitioner wins. Shackling carries a high risk of prejudice because it has inherent danger of showing Petitioner was – is a dangerous person. And the jury formed the opinion that Petitioner was dangerous. It was – this was viewed by the prosecutor's argument that her – tried to raise the specter of Petitioner might go off the handle and pop off in the courtroom and attack the investigating officer. Juror Burdett? Okay. Excuse me for interrupting, but your time is running. At some point, I would like to talk about the testimony that was not provided at the penalty phase, that is to say of the half-brother. But it may be most effective if I first question the State and then have a chance to question you on rebuttal. But at some point, I'd like to talk about that. Okay. Thank you. I would just – and my time is running out. I've got 23 minutes. Juror Burdett did not – You have five minutes and a few seconds. Yeah. I've got five – I'm sorry. I get dyslexic for numbers. I'm sorry. Juror Burdett did not doubt for a second that there was a discussion in the jury room that Petitioner might be dangerous in custody. He assured the jurors to discuss that. Shelley Tasker assured that point was discussed with the other jurors. Petitioner was on trial for the most serious of crimes. And he was branded as dangerous. I don't believe, Your Honors, the evidence supporting – the evidence which has to be considered in the prejudice analysis was overwhelming. In this case, two justices of the California Supreme Court voted to reverse. It was insufficient evidence of first-degree murder. In this case, the original district judge assigned to this case issued the writ for insufficient evidence of first-degree murder. I think on the unique facts of this case, Petitioner has shown that he was prejudiced by the shackling. Thank you. Thank you. Thank you. We'll hear from the warden. Good morning. May it please the Court. Deputy Attorney General Sumona Castellano here. Could you speak a little louder, please? On behalf of the Respondent. Counsel started with the ineffective assistance of counsel issue at the guilt phase regarding Petitioner's mental health, and so I'll address that first. What we have here is a district court finding that trial counsel made a reasonable tactical decision to prevent the jury from learning about a brutal prior murder of Professor Pierce where the Petitioner stomped his head against a concrete sidewalk, leaving him in a pool of blood, and a brutal prior rape of an elderly woman. It is inconceivable that counsel was constitutionally compelled to disclose that evidence to the jury by presenting a mental health expert. Yes, but that's not really the issue. The issue is whether or not he was ineffective in not making an in limine motion to figure out whether, if he introduced mental health evidence, the priors would come  in. Let me ask you this, and kind of playing off of the question we've already had. As I read the California cases involving introduction of priors once mental health evidence is introduced, the trial judge can let the priors in or keep them out, and it's a fairly normal sort of abuse of discretion standard. Is that how you read the California cases? No, Your Honor. As I read the cases that are cited on page 12 of our supplemental answering brief, there is a string of cases that says a prosecutor can cross-examine an expert about the foundation and basis of their opinion, and in doing so, they can discuss prior crimes. No, no. I read the same cases, and they say exactly what you say. Those are all cases in which the trial court allowed the cross-examination. But what I'm saying is I think the cases also say, if you look at the sort of introductory sort of framing of the question, the trial judge had the discretion to keep it out, but the reason it's coming up on appeal is that the trial judge exercised a discretion to let it in. Are you saying that the trial judge has no discretion to keep out the priors? I'm saying that the cases represent the law which is that the prosecutor has the ability to do it. No, no. You're not answering my question. Are you saying under California law, the trial judge has no discretion to keep out the priors in the cases that we've read? Your Honor, I think what I'm trying to say is that it would be an abusive discretion to keep the prosecutor from cross-examining because under the cases, they have that ability. Okay. Well, we disagree on how we read the cases, then. Wouldn't that depend on the nature of the defense? I'm sorry? Wouldn't that depend on the nature of the defense? Suppose he just decided to offer an intoxication defense. If it was just an intoxication defense, it is possible maybe a stronger argument that that, that the prosecutor might not have been able to cross-examine on that. However, if we go to the intoxication defense, the Petitioner's argument is even weaker. The time of the date of death in this case could not be set except for a two-week window. There is no indication and no evidence that they have presented even to date after an evidentiary hearing that the Petitioner was actually intoxicated at the time of the murder. It would not be enough to say around the date, on the date, before the date. They would have to show at the time he actually committed the murder, he was intoxicated. And he simply failed entirely to prove intoxication. As the District Court noted, there's a substantial hole in an intoxication type defense because of that period of time that they had not discovered the body and could not set the date for the murder. What if the defense is schizophrenia? That is to say, the defendant wants to put on evidence that he's schizophrenic and was hearing voices. Would it be an abuse of discretion for the trial judge to keep out evidence of priors? I think if we're not talking about intoxication, once they put their mental health in issue, yes, it opens the door to... I understand it opens the door, but I'm asking whether or not it would be an error, an abuse of discretion by the trial judge to say the priors stay out because, in my view, they are not sufficiently relevant to whether or not he was suffering schizophrenia and the prejudice is too great. Are you saying the trial judge cannot make that ruling under California law? I believe that that would have been an abuse of discretion under the cases. And even still, the issue here is not so much just looking at whether or not that is reasonable or inadmissible, but what are the chances? Petitioner would have to show that that motion would have absolutely been granted in his favor. No, no, no. That's wrong. The Petitioner does not have to show a certainty that the motion would have been granted. The Petitioner has to show a reasonable probability that the motion would have been granted. A reasonable probability? In order to prove ineffective assistance of counsel, though, their entire argument hangs on that one issue. And they simply haven't shown, even by a reasonable probability, that the trial court would have granted that motion. And that's their burden to bear. There is, under the cases, it just seems inconceivable that the trial court would prevent the prosecutor from arguing and cross-examining on an area of law that the California Supreme Court has said is a permissible and entirely proper area of cross-examination. So our argument is that the chances of such a motion are absolutely minuscule if any at all, and there is really no reasonable probability whatsoever that a motion like that would have been granted to Petitioner in this case. So Petitioner here has failed to prove, which is his burden at this stage, any of the elements for ineffective assistance of counsel based on mental health evidence at the guilt phase of the trial. I have a question about the penalty phase, and that has to do, I think Judge Fletcher has already alluded to, the Crawford evidence. And let me see if I can lay out a little bit my concern about that evidence in a little bit of detail so that you can respond in a helpful way. The district court declined to make a credibility determination about whether the investigator, Stewart, had actually spoken to Crawford, and if so, what had transpired. And the two of them had diametrically opposed testimony. The investigator said, I talked to him, he said he had absolutely nothing useful to give me, and that's the end of it. Whereas he said, no, I was never talked to and I would have come and this is what I would have said. His testimony contained at least one very serious issue that did not get to the jury's attention, which was sexual abuse of a very grotesque sort that had happened to him as a child. And so my question is this. If we were to conclude that the district court's prejudice analysis on that Crawford testimony is incorrect, what should we do about the absence of a credibility, determination, and factual findings on what actually occurred? Does that question make sense to you? Yes, it does, Your Honor. And I would respectfully disagree that the district court refused to make or did not make a finding about the contact as to Crawford. The court did say that because the petitioner did not bring Crawford to personally testify at the evidentiary hearing, he could not assess Crawford's credibility as to his testimony in general. But then the court went on to say that the evidence as a whole, so as between Crawford and the investigator Stewart, was mixed at best, but favors Respondent's position that Crawford was, in fact, contacted by Stewart. Well, that's kind of – that strikes me, at least, as a little bit waffly and not really a finding. And, you know, if we were to conclude that it's not quite a finding, what should we do? Even if the court concludes that that's not a finding, Your Honor, then the petitioner still has failed to meet his burden of demonstrating. And he had the burden of proof at the hearing that Crawford was not contacted and that he was cooperative. And at a bare minimum, the petitioner has failed to meet his burden of proving that. So on that basis – But the district court didn't decide that question. The district court jumped to prejudice and said there was no prejudice. Could you address the question of prejudice? Yes, Your Honor. As the district court found, there was no prejudice here. And even if we look at the sexual abuse allegations that Mr. Crawford made, those are wholly unsubstantiated hearsay allegations that were not corroborated by anybody, and he did not claim to personally witness those. Even the district court's order says that as to one of the allegations about a family member, it's something that he heard from his mother, but the mother never testified to that. They never brought any testimony from the mother to that effect, and they have produced no direct evidence of sexual assaults by a family member against the petitioner in this case. So the district court did not give any – a whole lot of credit or weight to the sexual abuse allegations because they were based entirely on hearsay, and they were not directly proven. As to the other testimony from Crawford, it's cumulative, just as the district court found, to the evidence of abuse that we already have before the jury in this case, and that was quite substantial. Well, on the question of hearsay, I'm not sure that that would have been excluded. There's a great deal of leeway given to evidentiary introductions at the penalty phase, and here's what Crawford says he would say and would have said had he been called. He says there was an anal rape of the defendant by his own biological father while they were still in New Orleans. They left New Orleans when the defendant was about five years old. He says there was an anal rape by Big Daddy when they got out to Hammond. He says that Big Daddy was such a monster that he got out the oil and raped the dog. He says that Big Daddy raped his dying wife after taking a belt buckle to her. He says that Big Daddy repeatedly beat him in the head because he couldn't remember. He says that the defendant was out in the backyard in a trance, would talk gibberish. He says not only was there the smoking episode where the branch, where the rope went over the branch, he testifies to another smoking episode where there was smoking at the smokehouse. He testifies to the defendant cutting himself. None of that is cumulative. The only thing that's cumulative is that he testifies to the smoking episode where it was thrown over the branch, but he testifies to a second smoking episode. So assuming that evidence is allowed in, how can there be no prejudice for not having introduced it? Your Honor, first I would say that that evidence would be inadmissible because it is hearsay and the hearsay rules do still apply. Well, not all of that is hearsay. He says he saw the second smoking episode. He says he saw Big Daddy beating him in the head repeatedly. He says he saw the defendant in the backyard in a trance. He saw the defendant talking gibberish. He knows that he himself, the family members, called him retarded. None of that's hearsay. Yes, Your Honor. I'm referring, and I'm sorry I wasn't more clear. I am referring to the sexual assault allegations. Those are based on hearsay, and the hearsay rules would still apply at the penalty phase. And importantly, the Petitioner himself in this case has denied that he was sexually abused by any of his family members. He denied that to the defense investigator. He denied that to Dr. Hamilton. And that evidence is clear. That's indisputed that he denied those sexual assaults. So, number one, as to sexual assaults, they would be inadmissible. And number two, to the extent that somehow we could even consider those, that weight of that would be drastically reduced by his personal denials that anything like that occurred and no other family member has corroborated or stepped in to verify or testify to anything to the same degree. And interestingly, at the penalty phase trial, the prosecutor asked one of the sisters right at the end of her testimony, is there anything else that you want this jury to know, anything that could help this Petitioner? And she did not offer anything else except that she didn't believe he did it. You are probably very experienced in these cases, as we are. It's very common for family members to minimize the horrific conditions of childhood. And some family members will talk about it. Many families will minimize. So the fact that the sister doesn't add anything doesn't tell me much. Well, I'm just trying to point out that that simply corroborates. And there is no evidence that she was minimizing. And as I've said, all we have is hearsay counts as to the sexual assaults. But I do want to say, also, there is no prejudice in any event, even as to these additional allegations about the trance and the abuse to the head, even if that's not technically cumulative. The jurors already knew that their grandfather, Big Daddy, was a huge, towering, brutal man, that he abused his family, that he abused Petitioner in particular on a regular basis with wood scraps, switches, leather straps. Linda described these as very severe. The jurors also did know about a smoking incident where Big Daddy put Petitioner in a burlap sack, tied a rope around it, hung it from a tree, and smoked him there for hours. That is a striking example of the type of abuse that this Petitioner had endured. And the jurors knew all about that. And that is exactly how trial counsel argued that to the jury at the penalty phase, that this exemplified the horrific upbringing that this Petitioner had. And he even admitted a photo of the tree and a sack, a burlap sack, to drive that point home. So that is something that the jurors already knew about. And he repeatedly argued that that was a torturing incident. So the jurors were well aware of that. They also heard through experts that Petitioner, well they heard directly from Petitioner's mother, that she had been molested by Big Daddy when she was 11. They heard about abuse of Petitioner's sisters, including an incident where one was beaten with an extension cord and Big Daddy was even arrested and taken to court for that incident. They knew that he refused to apply them wood to heat their home and water as punishment when he was angry at the family. They knew that Petitioner's father was abusive to his mother and she testified very specifically about one incident where he hit her and she was bleeding and she had to go and be treated for that. They also knew his parents were alcoholics and there was specific testimony about Petitioner's mother's struggle with alcohol and that she repeatedly drank and she even had to be treated with medication for that alcoholism. So the jurors already knew that Petitioner had an awful, abusive upbringing. And in addition to that, they knew he had long-standing severe mental illness dating all the way back to 1975. Dr. Patterson ran through all the three to five diagnoses he said that this Petitioner had mental disorders that were very complex. He described paranoid schizophrenia, personality disorder, brief reactive psychosis, substance abuse disorder, possibly atypical impulse control disorder, and again saying that the diagnostic label itself is not what's important because the experts here have disagreed for years about what the actual diagnosis is, but rather it all goes to show and all the experts agreed that he had serious mental disorders going all the way back to 1975. They also ---- Let me ask you this in a slightly different way. And this is not directed to the penalty phase, but rather to the ---- well, to some degree it is, but it's also directed to the guilt phase in terms of what did the doctors know as they were trying to diagnose him. Well, one of the ---- you're saying that they knew that he had mental difficulties going back to 1975, but if trial counsel had done his work properly, they would have known not only from the half-brother, but also from Short that there were mental difficulties going all the way back, very severe mental difficulties going all the way back to childhood. And that would have changed the diagnosis of the mental health experts. What do we do with that? Your Honor, there is no ---- there could not have been prejudicial in this case. There's no indication that the jurors could have thought that suddenly in 1975 this petitioner became mentally ill for no particular reason. And the doctors ---- Why do you say that? Because this goes all the way back. There was nothing about him being mentally ill earlier into childhood that is any different from the jurors knowing that it was documented at least as far back as 1975. And there are problems with Short's testimony. And the district court made a finding that counsel fully investigated Short. He got an 8-page report. I'm here not asking whether or not the Short testimony should have been introduced at the penalty phase. I think the trial counsel made a legitimate tactical decision to keep it out. On the other hand, it was information that had been provided to the mental health experts, information with respect to his mental difficulties at an early age, might have been useful to those mental health experts in making their diagnosis. Your Honor, they ---- there's no showing by the petitioner that any additional information provided to the experts would have materially changed their testimony in a favorable way. Even after giving them all the information that the petitioner has been able to compile over the course of many, many years, we still have varied diagnoses by a whole bunch of 5, 6, 7 mental health experts. And there's nothing about the new diagnoses, especially their favorite expert, Dr. Deadly, there's nothing more mitigating about Dr. Deadly's opinion and his diagnosis of schizoaffective disorder from the perspective of the jurors than all the diagnoses that Dr. Patterson walked the jurors through at the time of the penalty phase. There isn't anything that they've come up with except for tying it a little bit closer. Dr. Deadly did do that one thing. He tied the mental illness diagnoses a little bit closer to his childhood. But other than that, there's nothing more mitigating about what Dr. Deadly has offered than what Dr. Patterson already told the jurors. And as the Supreme Court said in Belmonte's, you don't even need an expert to draw those logical connections and common sense connections for the jurors. The jurors can figure that out on their own. They have common sense. And they can realize that this type of abusive upbringing absolutely most certainly would have impacted and affected his psychological makeup and would have contributed to his mental disorders. I'd like to do the same for you that I did for opposing counsel, which is to ask you to focus on the certifying issue about Shackling. Yes, Your Honor. As for Shackling, the district court again made a finding that the jurors in this case caught no more than brief sightings or glimpses of the petitioner in Shackles outside of the courtroom. And the petitioner cannot point to any unequivocal testimony from any juror that there was anything more than that. While petitioner likes to focus on juror Tasker, her testimony was highly equivocal. In fact, all the jurors, the three jurors who they produced in this case, their testimony was equivocal. There was back and forth between the direct and the cross. And the court found, and especially as to Tasker, she is the most unreliable of all three jurors because she made statements that all the other witnesses contradicted, such as seeing the petitioner in the courtroom in the orange jumpsuit. And so the district court did not even give her testimony any weight on account of that. The most confident statement that any juror made was by Juror Burditt. And he said he saw the petitioner being transported in the hallway in restraints one to 20 times, immediately followed by, I have no recollection. And that's at the excerpts of Record 478. So at most, the petitioner has been able to show that there were brief glimpses in the hallway. And under this Court's cases, that is not enough to demonstrate any prejudice from those glimpses in the hallway. And as has already been discussed, the court made a finding that there was no restraints applied in the courtroom. The petitioner completely failed to carry his burden of demonstrating that. And they cannot possibly demonstrate that that was clearly erroneous, given that the trial judge, the prosecutor, the defense attorney, the defense investigator, and the bailiff all supported the trial court's finding in that regard. So as to the guilt phase, Shacklin claimed the district court made a ruling that favors respondent. It's fully supported by the evidence in the record. And the petitioner has not carried his burden of demonstrating any kind of prejudice on that issue. Thank you. I would like to close with this. The ultimate issue is whether the petitioner had a fair guilt phase and fair penalty trial. He's not shown any constitutional errors at the guilt phase, and he did have a fair penalty trial, because in addition to the evidence that's already been discussed, the jurors already knew about three suicide attempts. They knew about the auditory hallucinations. They knew about the debilitating headaches. Duvall focused on the physical and mental health evidence, the physical abuse and mental health evidence during the closing argument. He methodically took the jurors through all of that evidence, and there's no possibility that the allegations that they have come up with now that would be admissible could possibly compare to the abusive evidence the jurors already knew about. So what they have now is even weaker than what they already had, and it would not come anywhere near the aggravating evidence in this case, which the Supreme Court has described a prior murder as the most powerful imaginable aggravating evidence, and that is precisely what we have in this case, a prior murder where he stomped the head of Professor Pierce against a concrete curb. The jurors had photographic evidence of that crime before them at the penalty phase, and on top of the most powerful evidence you can possibly have as aggravating evidence at a penalty phase, they also had the evidence of the prior brutal rape of the 61-year-old woman who lived across the street. What they have now doesn't even begin to compare to the mitigating evidence, and certainly not enough to tip the scales to such a degree as to overcome the aggravating evidence that the jurors already knew about. So we respectfully request that the district court judgment be affirmed. Thank you, counsel. Ms. Morrissey, you have some rebuttal time remaining. Thank you, Your Honor. I'm going to get Judge Fletcher to Gerald Crawford, but I just want to begin. The jurors didn't know George Wharton. They knew that he had antisocial personality disorder. That was the consensus of all the diagnoses. Dr. Patterson, the defense expert, testified to that in 1975, and he didn't much change it in 1987 when he testified at trial. Dr. Hamilton never was able to rule out schizophrenia. He had atypical impulse control. In other words, he's a violent person and can go off at any time. That was the – that was what the centerpiece of the penalty phase case was. George is violent.  You better watch out for George. That was the theme of the prosecutor in cross-examining the custodian of records from the California Department of Corrections. You know, this is a dangerous person who somehow let himself out of prison on a prior case. Counsel, you're almost out of time, and I would appreciate your response to the argument that the testimony of Crawford specifically concerning the sexual events would have been inadmissible as hearsay, because those items he did not claim to have seen, but only to have been told about by someone else. It is not inadmissible hearsay, Your Honor. Gerald Crawford talked about seeing the effects of. Well, seeing the effects of what, though? Where someone is physically abused, those same effects could occur. So I need a straightforward answer from you. Is there any suggestion that Crawford witnessed any sexual assaults? And if the answer to that is no, on what authority do you rest to say that, nonetheless, he could have testified to those? He described Senior's, the father's, sexual abuse of Petitioner. He didn't see it. Okay. He saw the after. He heard about it from someone else. Well, let me read the testimony. This is now the half-brother testifying. When my brother was over at the house, he'd done something or other. I don't know what was going on, but, you know, he wasn't going on there. But, anyhow, when he'd come back to the house, he was holding his little, you know, backside back there and asked him, what's wrong? And he said he was hurting. And so my mom, later on, my mom examined him, you understand, and he had, you know, been bleeding back there. And that's how she knew. There wasn't nothing she could do about it. Right. But he saw him come back holding his backside. Yes. He saw the after effects. And Gerald saw... And no surprise, no one would have seen the actual rape. Yes. Those things usually happen in private. But I think that Gerald Crawford and, you know, Robert Short was problematic. But I think that Gerald Crawford could have provided excellent testimony. You don't expect to get the abuser. What is your response to the counsel's argument that the district court already essentially made a credibility finding or a factual finding? I don't think the district court made a factual finding. I think the district court declined to make a factual finding on whether or not Gerald was available and assumed that he was for the purpose of making the decision that he did. And I have 28 seconds. Your Honor, the case law, you don't expect family secrets. Those happen often in these cases. Gerald's testimony was entirely admissible given the state of the art and the practice in penalty phase cases in California. And finally, Petitioner did not show mental disorders all the way back to 1975, as counsel argued and as trial counsel argued. He showed them since he was born. And the jury that sentenced him to death didn't know that. Thank you, counsel. Thank you. The case just argued is submitted. We appreciate very much the helpful arguments that both of you have made. And we will be adjourned until 10 o'clock.
judges: Graber, Fletcher, Paez